# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

No. 00-30104

MARY DIMM COZZO,

Plaintiff-Appellee,

versus

TANGIPAHOA PARISH COUNCIL-
PRESIDENT GOVERNMENT; ET AL,

Defendants,

and

J. E. LAYRISSON, Sheriff, Tangipahoa
Parish; RONALD JOINER, Deputy Sheriff of
Tangipahoa Parish,

Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Louisiana

January 10, 2002

Before STEWART and PARKER, Circuit Judges, and GOLDBERG, Judge.[1]

CARL E. STEWART, Circuit Judge:

---

[1]Judge of the United States Court of International Trade, sitting by designation.

The panel's opinion filed September 5, 2001, published at 262 F.3d 501 (5th Cir. 2001), is withdrawn and the following opinion is substituted therefor.

Defendants-Appellants, Sheriff J. E. Layrisson ("Sheriff Layrisson" or "Layrisson") and Deputy Ronald Joiner ("Deputy Joiner" or "Joiner"), claim that the district court erred by denying their motion for a judgment as a matter of law or, in the alternative, for a new trial regarding the jury verdict in favor of Plaintiff-Appellee Mary Dimm Cozzo ("Ms. Cozzo"), finding that Joiner deprived Ms. Cozzo of her constitutional rights and that Layrisson was deliberately indifferent to that deprivation. For the reasons assigned herein, we affirm the district court in part and reverse in part.

FACTUAL AND PROCEDURAL BACKGROUND

Ms. Cozzo and Joseph Cozzo ("Mr. Cozzo") lived in Folsom, Louisiana, on property that belonged separately to Ms. Cozzo. The premises contained an apartment dwelling and a barn that stored tools and equipment. After experiencing marital discord, Mr. Cozzo, an electrician who traveled to customers' homes to repair appliances and electrical systems, moved out, filed for divorce, and sought a temporary restraining order ("TRO") to prevent Ms. Cozzo from coming to his residence and place of business.

After Mr. Cozzo successfully secured the TRO on September 22, 1997, the Civil Department of the Tangipahoa Parish Sheriff's Department served the order. Captain James Peoples ("Captain Peoples"), a department supervisor, visited the marital premises. Ms. Cozzo was at work, but Mr. Cozzo was present and informed Captain Peoples that he worked on the property. Upon receiving this information and without attempting to contact the judge who signed the TRO to determine its intended scope and application, Captain Peoples decided that the TRO required Ms. Cozzo to be evicted from the property. After leaving Mr. Cozzo and returning to the Sheriff's Office, Captain

2

Peoples informed Deputy Joiner that the TRO required Ms. Cozzo's removal from the property and instructed him to go await her return from work and serve the TRO accordingly.

Deputy Joiner returned to the premises that evening and served the TRO on Ms. Cozzo upon observing her arrive from work around 10:00 p.m. He told her that, under the terms of the TRO, she would have to leave. Ms. Cozzo protested, telling him that the matrimonial premises were her separate property. Deputy Joiner called Captain Peoples and informed him of Ms. Cozzo's assertion. Still convinced, however, that the TRO required her eviction, Captain Peoples spoke with Ms. Cozzo on the telephone and reiterated Deputy Joiner's previous order that she leave the property. Ms. Cozzo then called her nephew, a St. Tammany Parish Sheriff's Deputy, and her lawyer seeking counsel on how to handle the situation. They both advised her to cooperate with Deputy Joiner, so she gathered her belongings and left.

The following day, Ms. Cozzo contacted her attorney again and asked him to handle the legal proceedings regarding her eviction. A hearing was set for December 1, 1997, to determine whether Mr. or Ms. Cozzo was the legal occupant of the house. Because of a scheduling conflict, the hearing was delayed until February 2, 1998, but was not ultimately held until March 2, 1998.[2] At that hearing, Ms. Cozzo was awarded custody of the residence, and Mr. Cozzo was directed to evacuate the premises. Moreover, the judge who signed the TRO was amazed that it had been interpreted to require Ms. Cozzo's eviction and stated that she should sue the Sheriff.

Ms. Cozzo sued Tangipahoa Parish ("the Parish"), Sheriff Layrisson, and Deputy Joiner under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §

---

[2]During the interim, Ms. Cozzo lived with her daughter and incurred expenses associated with helping build an addition to her daughter's home.

1983, alleging that her home was purposefully and intentionally seized, that inadequate training caused the violations of her constitutional rights, and that Sheriff Layrisson and Deputy Joiner's conduct was in reckless disregard for her property and constitutional rights.[3] The Parish, Sheriff Layrisson, and Deputy Joiner filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), raising arguments that they were entitled to qualified immunity and that the suit was barred by the Parratt/Hudson[4] doctrine, which the district court denied.

After the parties filed a joint motion to dismiss the Parish, Ms. Cozzo's case proceeded to trial. The jury found that Sheriff Layrisson and Deputy Joiner had infringed her constitutional rights and awarded her $15,000 for pain and suffering, $10,000 for economic loss, and $35,000 in punitive damages. The district court entered judgment in accordance therewith. Sheriff Layrisson and Deputy Joiner filed a motion for judgment as a matter of law or, in the alternative, a motion for new trial that the district court denied. See Cozzo v. Parish of Tangipahoa, No. CIV.A. 98-2728, 2000 WL 6280, at *11 (E.D. La. Jan. 3, 2000). They now appeal.

DISCUSSION

"We review de novo the district court's ruling on a motion for judgment as a matter of law" but note that, in an action tried by a jury, such a motion is a challenge to the legal sufficiency of the evidence supporting the jury's verdict. Brown v. Bryan County, Okla., 219 F.3d 450, 456 (5th Cir. 2000). As such, while we consider the evidence "drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party[,]" we nonetheless

---

[3]Captain Peoples is not named as a defendant in the instant dispute.

[4]See Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908 (1981); Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194 (1984).

4

observe "that our standard of review with respect to a jury verdict is especially deferential." Id. Thus, we will reverse "'only if no reasonable jury would have arrived at its verdict.'" Id. (quoting Snyder v. Trepagnier, 142 F.3d 791, 795 (5th Cir. 1998)).

I.    Immunity

A.    Sovereign Immunity

Layrisson and Joiner argue for the first time on appeal that sheriffs and their deputies are "arms of the state" entitled to sovereign immunity. In the alternative, they claim that, even if they are not properly considered arms of the state, they are still entitled to sovereign immunity because they were acting pursuant to state law when they executed the TRO against Ms. Cozzo.

Sovereign immunity is jurisdictional. Koehler v. United States, 153 F.3d 263, 267 (5th Cir. 1998). Moreover, "[a] lack of subject matter jurisdiction may be raised at any time, which means we can examine the district court's jurisdiction for the first time on appeal." Giles v. Nylcare Health Plans, Inc., 172 F.3d 332, 336 (5th Cir. 1999). As with other questions of subject matter jurisdiction, we review Eleventh Amendment immunity determinations de novo. United States v. Tex. Tech. Univ., 171 F.3d 279, 288 (5th Cir. 1999).

The Eleventh Amendment bars a state's citizens from filing suit against the state or its agencies in federal courts. Williams v. Dallas Area Rapid Transit, 242 F.3d 315, 318 (5th Cir. 2001). When a state agency is the named defendant, the Eleventh Amendment bars suits for both money damages and injunctive relief unless the state has waived its immunity. See Puerto Rico Aqueduct & Sewer Auth., 506 U.S. 139, 144 (1993). By statute, Louisiana has refused any such waiver of its Eleventh Amendment sovereign immunity regarding suits in federal courts. See LA. REV. STAT. ANN. § 13:5106(A).

5

Furthermore, Congress may only abrogate a state's Eleventh Amendment immunity by "unequivocally" expressing its intent to do so and by acting "pursuant to a valid exercise of power." Fla. Prepaid Postsecondary Educ. Expenses Bd. v. Coll. Sav. Bank, 527 U. S. 627, 634 (1999). We note that in enacting § 1983, Congress did "not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States." Quern v. Jordan, 440 U.S. 332, 345 (1979). As such, if Layrisson and Joiner are the alter egos of Louisiana, they are entitled to immunity from Ms. Cozzo's suit. See Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183, 186 (5th Cir. 1986).

This court uses a six factor test to determine whether "the state is the real, substantial party in interest." Hudson v. City of New Orleans, 174 F.3d 677, 681 (5th Cir. 1999). The six factors are as follows:

1. Whether the state statutes and case law view the agency as an arm of the state;
2. The source of the entity's funding;
3. The entity's degree of local autonomy;
4. Whether the entity is concerned primarily with local as opposed to statewide problems;
5. Whether the entity has the authority to sue and be sued in its own name; and
6. Whether the entity has the right to hold and use property.

Id. All of these factors need not be present for a defendant to be entitled to Eleventh Amendment immunity. Id. at 682. Indeed, the second factor is most important because a fundamental goal of the Eleventh Amendment is to protect state treasuries. Id. (citing Delahoussaye v. City of New Iberia, 937 F.2d 144, 147-48 (5th Cir. 1991)). In contrast, the last two factors weigh significantly less in the six factor balance of equities used to determine "whether the suit is in reality a suit against the state itself." Id. (internal quotations and citation omitted).

The first Hudson factor does not support Layrisson's and Joiner's contentions that they are entitled to sovereign immunity. While an argument can be made that Louisiana considers sheriffs an

6

arm of the state because its constitution discusses sheriffs under the judicial branch of state government,[5] this contention is undercut by the fact that "'Louisiana does not [actually] view the sheriff as a 'state agency.'" Porche v. Saint Tammany Parish Sheriff's Office, 67 F. Supp. 2d 631, 634 (E.D. La. 1999)(citing LA. REV. STAT. § 13:5102(A)). This fact is born out in Louisiana statutory law, which excludes any political subdivision or any agency of a political subdivision from its definition of a state agency. Id.[6] In Louisiana, "the definition of a 'political subdivision' includes 'sheriff.'" Id. (citing LA. REV. STAT. § 13:5102(B)); see also Rome v. Traylor, 620 So. 2d 1163, 1166 (La. 1993)(stating that "[a] sheriff is a *parish official*, being the chief law enforcement officer of the parish")(emphasis added); Jones v. Traylor, 660 So. 2d 933, 935 n.3 (La. App. 4th Cir. 1995)(observing that as a unit of local government authorized by law to perform governmental functions, a sheriff would be included within the definition of a political subdivision). Thus, the Louisiana statutes and case law can fairly be read to stand for the proposition that sheriffs are political subdivisions that are not protected by the Eleventh Amendment. However, because at least one Louisiana court has opined to the contrary, taking the view that sheriffs are state officers, see Nall, 542 So. 2d at 149 n.4, the first Hudson factor is ambiguous in that it neither supports nor refutes Layrisson's and Joiner's assertion of sovereign immunity. See Hudson, 174 F.3d at 686 (agreeing with the district court's assessment that the first factor pointed in different directions and declining "to count it either in support for, or denial of, Eleventh Amendment immunity").

---

[5]See LA. CONST., art. 5, § 2; Nall v. Parish of Iberville, 542 So.2d 145, 149 n.4 (La. App. 1st Cir. 1989)(reasoning that by placing "the provision dealing with sheriffs . . . in article 5, § 27," Louisiana indicated that "the sheriff's office was not intended to be a unit of local government").

[6]We note that the United States Supreme Court has stated that political subdivisions are not protected by the Eleventh Amendment. See Port Auth. Trans-Hudson Corp. v. Feeny, 495 U.S. 299, 110 S. Ct. 1868, 1877, 109 L. Ed. 2d 264 (1990).

The most important Hudson factor, the source of the entity's funding, requires a two-part inquiry. First, we must address the state's liability for any judgment against Sheriff Layrisson and Deputy Joiner. Second, we consider Louisiana's liability for the Parish Sheriff Department's general debts and obligations. See id. at 687. Regarding the first prong of the source of funding inquiry, Louisiana Revised Statute 42:1441 provides that "[t]he state of Louisiana shall not be liable for any damage caused by a . . . sheriff . . . within the course and scope of his official duties, or damage caused by an employee of a . . . sheriff . . . ." With respect to the second prong, Layrisson and Joiner cite no case law or statutory provisions authorizing the state of Louisiana's general funding of local sheriffs' offices. As there seems to be no such authority requiring Louisiana to provide funds for sheriffs' offices to pay their general debts and obligations, Louisiana appears to be "fiscally isolated from judgments against the sheriff." Porche, 67 F. Supp. 2d at 635. Thus, the most important Hudson factor militates against a finding that Sheriff Layrisson and Deputy Joiner are entitled to sovereign immunity.

The third factor, degree of local autonomy, points to a finding of no immunity because Louisiana sheriffs are limited to the territorial boundaries of their respective parishes. See Burge v. Parish of Saint Tammany, 187 F.3d 452, 469 (5th Cir. 1999)("Under the Louisiana Constitution and laws, a district attorney, like a sheriff, is virtually an autonomous local government official."); Porche, 67 F. Supp. 2d at 635 (finding that Louisiana sheriffs' degree of local autonomy weighed against Eleventh Amendment immunity); Hayes v. Parkem Indus. Serv., Inc., 598 So. 2d 1194, 1197 (La. App. 3d Cir. 1992). Thus, despite enforcing state laws and performing sundry duties for Louisiana's benefit, sheriffs are concerned with local problems because those "duties are generally performed only

8

within a given parish." Porche, 67 F. Supp. 2d at 635. Accordingly, the fourth Hudson factor does not favor a finding that Layrisson and Joiner are entitled to sovereign immunity.

The fifth factor cuts against Eleventh Amendment immunity if the entity can sue or be sued. Hudson, 174 F.3d at 691. In Hudson, "[t]he parties agreed that the Orleans Parish District Attorney's office, as an entity, cannot itself sue or be sued," but recognized that all suits must be "brought by or against the district attorney in his official capacity." Hudson, 174 F.3d at 691. Observing that "the distinction between the entity and an entity's officer sued in his official capacity is irrelevant for purposes of [the] Eleventh Amendment inquiry[,]" this court found that the fifth factor did not favor a finding of immunity. Id. This reasoning is applicable to the instant query. Namely, although a sheriff's office is not a legal entity capable of being sued, Louisiana sheriffs are amenable to suit. Porche, 67 F. Supp. 2d at 635 ("The law of Louisiana affords no legal status to the Parish Sheriff's Department wherein said department can sue or be sued, such status being reserved for the Sheriff. . . .")(internal quotations and citation omitted); Ferguson v. Stevens, 623 So. 2d 711, 714 (La. App. 4th Cir. 1993)(reasoning that the Sheriff's Office has consistently "been held to be a non-entity incapable of being sued[,]" but concluding that the Sheriff was liable in his official capacity). As Sheriff Layrisson may be sued, though the Parish Sheriff's Department may not, this factor also militates against a finding of immunity.

Our review of the sixth and final Hudson factor, whether the entity has the right to hold and to use property, reveals that, under Louisiana law, "[e]ach parish shall provide and bear the expense of a suitable building and requisite . . . furniture and equipment as may be needed by the sheriffs . . . ." LA. REV. STAT. § 33:4713. Notwithstanding this provision, "a sheriff . . . may purchase and equip such real property as is necessary in the performance of his duties[,]" but "[t]he ownership of

9

such real property shall be vested in the parish law enforcement district." LA. REV. STAT. § 33:1422(D). While the statutes provide for Louisiana sheriffs' use of property, they do not similarly contemplate the sheriffs' holding an ownership interest in that property. Accordingly, the last Hudson factor points to a finding that the Eleventh Amendment provides no protection to Louisiana sheriffs against suit.

Because none of the Hudson factors favor Sheriff Layrisson and Deputy Joiner, we hold that they are not entitled to sovereign immunity against Ms. Cozzo's claims. See Porche, 67 F. Supp. 2d at 636 (stating that "[a]n analysis of the *Hudson* factors leads to a determination that a sheriff in Louisiana may not be properly characterized as an arm of the state and, therefore, the Eleventh Amendment affords a sheriff in Louisiana no protection against being sued" and concluding that the sheriff was not entitled to immunity from suit).

B. Absolute Immunity

Sheriff Layrisson and Deputy Joiner also contend that they are entitled to absolute immunity because they were acting pursuant to their authority as officers of the court when they served Ms. Cozzo with the TRO and evicted her from her property. They claim that they should receive the same immunity as would a judge because Ms. Cozzo's suit arises from their enforcement of a court order.

Absolute immunity is an affirmative defense that is waived if it is not pleaded. Boyd v. Carroll, 624 F.2d 730, 732-33 (5th Cir. 1980). Although Layrisson and Joiner raised qualified immunity as a defense to Ms. Cozzo's claims, neither their answer nor motion to dismiss plead the affirmative defense of absolute immunity. Consequently, they have waived this defense, and we therefore do not reach the merits of this argument.

C. Qualified Immunity

10

Sheriff Layrisson and Deputy Joiner also argue that the district court erred by finding their asserted defense of qualified immunity inapplicable to the instant dispute. They maintain that they are entitled to qualified immunity from Ms. Cozzo's claims because interpretation of the TRO to require her eviction was clearly within Captain People's discretionary authority. We review the denial of qualified immunity de novo. Brady v. Fort Bend County, 58 F.3d 173, 174 n.1 (5th Cir. 1995)(citing Pierce v. Underwood, 487 U.S. 552, 558, 108 S. Ct. 2541, 2546, 101 L. Ed. 2d 490 (1988)).

"The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions. . . ." Thompson v. Upshur County, Tex., 245 F.3d 447, 456 (5th Cir. 2001). The Supreme Court has characterized the doctrine as protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271(1986). To determine whether a defendant falls somewhere in the spectrum between the polar extremes of incompetency and knowing violation, this court conducts a bifurcated analysis. E.g., Thompson, 245 F.3d at 457.

First, we must decide whether the plaintiff alleged a violation of a clearly established constitutional right. See Siegert v. Gilley, 500 U.S. 226, 231 (1991); Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998). A right is "clearly established" if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct 3034, 97 L. Ed. 2d 523 (1987). Second, we must address whether the defendant's "conduct was objectively reasonable in light of clearly established law at the time that the challenged conduct occurred." Glenn v. City of Tyler, 242 F.3d 307, 312 (5th Cir. 2001). "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in

11

the defendant's circumstances would have then known that the defendant's conduct violated the" plaintiff's asserted constitutional or federal statutory right. Thompson, 245 F.3d at 457 (citing Anderson, 107 S. Ct. at 3040; Malley, 106 S. Ct. at 1096)(emphasis in original). Thus, an individual defendant's subjective state of mind is irrelevant to the qualified immunity inquiry. Id. Because Deputy Joiner effectively concedes on appeal that his actions violated Ms. Cozzo clearly established Fourth Amendment rights, we are required to address only the second prong of the qualified immunity test, that is, whether Deputy Joiner's actions were objectively reasonable.

### 1. Individual Liability

The district court found the statement "I don't care what she says–put her out," Captain Peoples's response to Ms. Cozzo's claims that the marital premises were her separate property, to be "the embodiment of the phrase deliberate indifference."[7] Cozzo, 2000 WL 6280, at *10. It further found that Deputy Joiner removed Ms. Cozzo from her home under the color of law based on an order that on its face neither states nor requires eviction. Id. Taken together with the fact that it took Ms. Cozzo nearly half a year to regain possession of her home, the court concluded that Sheriff Layrisson and Deputy Joiner were not entitled to the defense of qualified immunity. Id.

Our review of the record reveals that Deputy Joiner's removal of Ms. Cozzo from her home pursuant to the TRO was objectively unreasonable and, thus, supports the district court's conclusion that Deputy Joiner enjoys no qualified immunity against Ms. Cozzo's claims. We observe that, although Deputy Joiner attested that he never read the TRO and was only following the orders of

_____

[7]Deliberate indifference is a standard applied to Fourteenth Amendment substantive due process claims, not Fourth Amendment claims. Most often, the standard arises in the context of a prisoner's right to medical care or a state's failure to train or supervise officers. Clearly, the Fourth Amendment is the constitutional right at issue in this case.

12

Captain Peoples, who claimed that he read the TRO and interpreted it to require Ms. Cozzo's removal from her home, the record reflects that Deputy Joiner was well aware of the cause of Ms. Cozzo's concerns and the need for clarification. Ms. Cozzo testified that she perused the TRO and attached papers in Deputy Joiner's presence. Ms. Cozzo attested that, after so doing, "I showed him on the back of the papers that they had a paper showing that my husband and I had separated the community property. There was no community property, and that the house was mine." In response, Deputy Joiner contacted Captain Peoples, and Ms. Cozzo reiterated her position. Undaunted by her revelation and unpersuaded to reconsider his initial determination that the TRO required her removal from the property, Captain Peoples callously informed Ms. Cozzo that he did not care what the papers said and that she would have to leave her home. Upon completing his subsequent conversation with Captain Peoples, Deputy Joiner acquiesced, stating: "'My supervisor says it doesn't matter what the papers say, you still have to go.'"

Captain Peoples's clearly stated abject disregard for and Deputy Joiner's patently unaroused curiosity about "what the papers say" undercut Deputy Joiner's claim that he acted reasonably by evicting Ms. Cozzo. Had he read the TRO, Deputy Joiner would have found that the term eviction is unmistakably absent from the order. Additionally, had he taken the time to look at the attached papers, Deputy Joiner would have noticed that Mr. Cozzo's Petition for Divorce and Determination of Incidental Matters contained the following statement:

> Petitioner avers some of his personal belongings are located in the *former matrimonial domicile*, located at 49060 Turnpike Road, Folsom, Louisiana 70437, *which is occupied at the present time by the defendant, Mary Dimm Cozzo*. Petitioner avers it is necessary for this Honorable Court to order a deputy of Tangipahoa Parish Sheriff's Office, or other appropriate law enforcement officer, to accompany him to said residence so he may obtain possession of his personal property.

13

(emphasis added).

This language demonstrates that Mr. Cozzo no longer occupied the home he formerly shared with Ms. Cozzo. Its full significance becomes clear, however, only upon reading the order granting Mr. Cozzo's request for a TRO, which provides in pertinent part "that a temporary restraining order issue. . . directed to . . . Mary Dimm Cozzo, restraining, enjoining, and prohibiting the defendant, her agents or assigns . . . from communicating with the petitioner in any way, *from going to his place of residence or employment*, or accosting him in any fashion." (emphasis added). Accordingly, Captain Peoples's claim that Ms. Cozzo had to be removed from her home to comply with the provision of the TRO restraining her from going to Mr. Cozzo's place of residence is unpersuasive in that Mr. Cozzo's divorce petition indicates that only Ms. Cozzo occupied their former matrimonial domicile at the time that he requested the TRO.

Moreover, Captain Peoples's asserted alternative basis for interpreting the TRO to require Ms. Cozzo's removal from her home does not change our conclusion that it was objectively unreasonable to evict her. In particular, despite the property bearing no sign indicating a business, Captain Peoples testified that he determined that Mr. Cozzo's place of business was located at 49060 Turnpike Road, the former matrimonial domicile, because he saw some tools in the barn and Mr. Cozzo told him the property was his place of business. We note, however, that in making this determination Captain Peoples never even inquired of Ms. Cozzo whether Mr. Cozzo actually worked on the property, a claim that Ms. Cozzo denied in sworn testimony.[8] Moreover, when she talked to

---

[8]On direct examination, Ms. Cozzo testified as follows:

Q. At the time that this document was served on you, . . . . [w]as his place of employment at 49060 Turnpike Road?
A. No, it was not.

14

Captain Peoples on the telephone in an attempt to explain that the eviction was a mistake, neither Mr. Cozzo's place of residence or business nor the provisions of the TRO were of any concern to Captain Peoples; he merely told her to get out. We find that Captain Peoples's actions clearly violated Ms. Cozzo's Fourth Amendment right to be free from unreasonable seizures. Deputy Joiner's subsequent eviction of Ms. Cozzo was objectively unreasonable in light of the facts and circumstances in the case at bar. Accordingly, we affirm the district court's decision to deny Deputy Joiner's qualified immunity claim.

### 2. Supervisory Liability

#### a. Failure to Train

We are unpersuaded, however, that the district court's denial of Sheriff Layrisson's qualified immunity claim merits a similar conclusion. In denying Sheriff Layrisson's motion for judgment as a matter of law or, in the alternative, motion for new trial, the district court correctly observed that liability under the doctrine of respondeat superior is not cognizable in § 1983 actions. Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 452 (5th Cir. 1994)(en banc). However,

> [a] sheriff not personally involved in the acts that deprived the plaintiff of [her] constitutional rights is liable under section 1983 if: 1) the sheriff failed to train or supervise the officers involved; 2) there is a causal connection between the alleged

Q. What does Mr. Cozzo do?
A. He's an electrician.
Q. And, so what does he do as an electrician?
A. Well, if you have problems with your lights or wiring, you would call him and *he would go out to your house and check out the problem at your house* and then bill you, and you would pay him. (emphasis added).
Q. Okay. Did he work out of your home on his business?
A. No, ma'am, it would always have been at . . . their building, their home, or whatever they had that they wanted him to fix.

15

failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.

Thompson, 245 F.3d at 459 (citations omitted).  Proof of a single instance, rather than a pattern of similar violations, normally will not sustain a plaintiff's claim that such a lack of training or supervision caused a violation of her constitutional rights.  Id. (citing Snyder v. Trepagnier, 142 F.3d 791, 798-99 (5th Cir. 1998); Thompkins v. Belt, 828 F.2d 298, 304-05 (5th Cir. 1987)).  Finally, the training's inadequacy "must be obvious and obviously likely to result in a constitutional violation." Id. (citing City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 1205 n.10, 103 L. Ed. 2d 412 (1989)).

The district court found that Ms. Cozzo introduced "evidence that the employees of the Sheriff's Office were improperly trained."  Cozzo, 2000 WL 6280, at *5.[9]  It determined that "a reasonable juror could have concluded that Sheriff Layrisson, by failing to train his employees or set any specific rules regarding actions allowed by his deputies with . . . TROs in domestic cases, was deliberately indifferent to unauthorized evictions."  Id.  Our review of the record confirms the district court's former finding, but the law does not support its latter determination.

Ms. Cozzo elicited testimony from David Kent ("Kent"), her training expert, regarding the general training requirements for Louisiana peace officers.[10]  He informed the jury that the state-

_____

[9]Sheriff Layrisson and Deputy Joiner contest this finding on appeal.

[10]See LA. REV. STAT. ANN. § 40:2405A(1).  This statutory provision, entitled Peace Officer Training Requirements, provides:

Notwithstanding any other provisions of law to the contrary, any person who begins employment as a peace o fficer in Louisiana subsequent to January 1, 1986, must successfully complete a certified training program approved by the council and successfully pass a council-approved comprehensive examination within one calendar

16

required peace officer training consisted of an eight-week, 320-hour course. He further attested that, upon completion of this course, officers receive a basic certificate of general police knowledge and instruction. Counsel for Ms. Cozzo then introduced evidence of Deputy Joiner's training records, which documented his completion of various training programs, but did not contain the aforementioned peace officer training certificate.

Captain Peoples further confirmed the validity of this documentation by testifying that, to his knowledge, Deputy Joiner had not completed the basic peace officer training course, but asserted that, as a civil deputy, he believed that Joiner was exempt from these training requirements. Joiner articulated the same belief during his testimony. On cross-examination, Kent nonetheless maintained that Louisiana law required Deputy Joiner to complete peace officer training and that, since his training records indicated that he had not done so, Deputy Joiner's training did not comport with the state's requirements. Thus, Sheriff Layrisson and Deputy Joiner failed to adduce evidence at trial unequivocally demonstrating that the proffered training provisions were inapplicable to Deputy Joiner.[11]

Based on the evidence before it, therefore, the jury could have found that Ms. Cozzo established the first prong needed to demonstrate supervisory liability under the failure to train theory. We also find that the jury could have inferred a causal connection between this lack of training and Deputy Joiner's eviction of Ms. Cozzo. But we part company with the district court on the issue of

---

year from the date of initial employment. Any person who fails to comply with this requirement shall be prohibited from exercising the authority of a peace officer; however, such persons shall not be prohibited from performing administrative duties.

[11]See discussion *infra* Part III.B.

whether the proffered evidence of Sheriff Layrisson's alleged failure to train ultimately demonstrated a deliberate indifference to Ms. Cozzo's right not to be unconstitutionally deprived of her property.

In particular, Ms. Cozzo's eviction pursuant to Captain Peoples's interpretation of the TRO is unprecedented in the Sheriff Department's history. As such, it implicates the "single incident exception" for establishing failure to train liability. See Gabriel v. City of Plano, 202 F.3d 741, 745 (5th Cir. 2000)(citing Bd. Of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 405, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). Prevailing under this exception "requires proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different . . . training." Id. We note, however, that this court has often rejected application of the single incident exception. Conner v. Travis County, 209 F.3d 794, 797 (5th Cir. 2000); Gabriel, 202 F.3d at 745; McClendon v. City of Columbia, No. 00-60256, 2001 WL 776813, at * 8 (5th Cir. July 26, 2001)(observing, however, that in Brown v. Bryan County, Okla., 219 F.3d 450 (5th Cir. 2000), t his court found the county liable under the single incident exception when it "failed to provide *any* training or supervision for a young, inexperienced officer with a record of recklessness[,]" but also noting that "there is a difference between a *complete failure to train*, as in Bryan, and a failure to train in one limited area" )(emphasis added).

Although we agree with the district court that the testimony of Ms. Cozzo's expert witness, stating that Joiner never attended Louisiana's 320-hour peace officer training course, provided evidence sufficient for the jury to infer that Sheriff Layrison failed to train Deputy Joiner, we emphasize that proffering this testimony did not end Ms. Cozzo's evidentiary burden. Even taking the evidence in the light most favorable to the jury's verdict that Sheriff Layrisson's failure to train Deputy Joiner actually caused Ms. Cozzo's injury, Ms. Cozzo still bore the onus to prove that this

18

failure to train constituted deliberate indifference to her right not to be unconstitutionally dispossessed of her property. Kent's testimony alone is, however, insufficient to meet this burden. See Conner, 209 F.3d at 798 (stating that plaintiffs generally cannot show deliberate indifference through the opinion of only a single expert).

Moreover, Captain Peoples's attestation that, in nineteen years of working for the Sheriff's Department, he had received and was aware of no citizens' complaints against any employee regarding the manner in which orders are served cuts against Ms. Cozzo's failure to train supervisory liability claim. Specifically, the elapsing of almost two decades without any such complaint being lodged suggests that the inadequate training was not "obvious and obviously likely to result in a constitutional violation." Id.; see also Conner, 209 F.3d at 797 (reasoning that "if the need for training . . . was 'so obvious' and the failure to train was 'so likely to result in the violation of constitutional rights[,]'. . . Connors would be able to identify other instances of harm arising from the failure to train"). Ms. Cozzo pointed to no other evictions based on TROs or any such similar events in the Sheriff Department's history and therefore neglected to proffer proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different training. As such, Ms. Cozzo adduced evidence legally insufficient to support the jury's finding of deliberate indifference. Accordingly, this case does not fit within the single incident exception, and Sheriff Layrisson has persuasively argued that the district court erred in concluding that Ms. Cozzo demonstrated failure to train supervisory liability.

b.      Official Policy

Supervisory liability may additionally exist "without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a

19

repudiation of constitutional rights and is the moving force of the constitutional violation."

Thompkins, 828 F.2d at 304 (internal quotations and citations omitted). An official policy is:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [government entity] . . . or by an official to whom the [entity] ha[s] delegated policy-making authority; or

2. A persistent, widespread practice of . . . officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [the entity's] policy.

Johnson v. Moore, 958 F.2d 92, 94 (5th Cir. 1992). A plaintiff may also establish a custom or policy based on an isolated decision made in the context of a particular situation if the decision was made by an authorized policymaker in whom final authority rested regarding the action ordered. City of Saint Louis v. Praprotnik, 485 U.S. 112, 124-25, 108 S. Ct. 915, 924-25, 99 L. Ed. 2d 107 (1988); Bennett v. Pippin, 74 F.3d 578, 586 (5th Cir. 1996).

The district court concluded that Sheriff Layrisson maintained a policy that deprived Ms. Cozzo of her constitutional rights. Cozzo, 2000 WL 6280, at *10. The court stated that Sheriff Layrisson's practice and policy was to grant his employees or supervisors power to interpret a TRO compelling one spouse to stay away from the other spouse's residence or place of employment as requiring eviction of the spouse upon whom the TRO is served rather than to authorize employees and supervisors to serve the order and simply allow the protected spouse to follow appropriate legal procedures should the restrained spouse violate the TRO. Id. In the court's reasoned estimation, the Sheriff's Department also perpetuated a practice, effectuated through Captain Peoples, to forsake the advice of an order's signatory judge about its intended scope and to ignore the protestations of late

20

night evictees despite the relevance of their statements regarding the inappropriateness of the eviction. Id.

Our review of the record does not comport with the district court's conclusions. While it is replete with evidence regarding the specific incident of Ms. Cozzo's eviction, the record contains scant proof regarding a policy statement, ordinance, regulation, or decision that Sheriff Layrisson officially adopted and promulgated regarding the service of TROs. It is also devoid of evidence that Sheriff Layrisson delegated any policy-making authority to Captain Peoples.[12] Indeed, we note that Sheriff Layrisson did not testify at all during trial.

Moreover, as we previously observed, the evidence demonstrates that Ms. Cozzo's eviction, pursuant to a TRO that did not explicitly authorize such action, is an unprecedented event in the last twenty years of the Sheriff's Department's history. Thus, Ms. Cozzo failed to establish the existence of a persistent, widespread practice of the Department's officials or employees, which, although not authorized by an officially adopted and promulgated policy, is nonetheless so common and well settled as to constitute a custom that fairly represents department policy. Having failed to demonstrate the existence of an official policy, the evidence simply did not substantiate a finding that Sheriff Layrisson implemented a policy so deficient that it was a repudiation of Ms. Cozzo's constitutional rights and was the moving force of the unconstitutional dispossession of property that she suffered. Accordingly, we hold that the district court erred in concluding that Sheriff Layrisson does not enjoy qualified immunity against Ms. Cozzo's claims.

---

[12]Thus, Ms. Cozzo's ability to demonstrate a custom or policy based on Captain Peoples's isolated decision to evict her is foreclosed. See Bennett, 74 F.3d at 586 (stating that "a single decision may create . . . liability *if* that decision were made by a final policymaker responsible for that activity")(internal quotations and citations omitted)(emphasis in original).

21

II.     Parratt/Hudson Doctrine

Sheriff Layrisson and Deputy Joiner contend that Ms. Cozzo's allegations were based on a violation of her procedural due process rights and that she presented no substantive claims. As such, they argue that the district court erred in declining to dismiss this case under the Parratt/Hudson doctrine. They also argue that state law provides an adequate remedy for wrongful eviction. See LA. CODE CIV. PROC. ANN. art. 3608.

The "Parratt/Hudson doctrine dictates that a state actor's random and unauthorized deprivation of a plaintiff's property does not result in a violation of procedural due process rights if the state provides an adequate post-deprivation remedy." Myers v. Klevenhagen, 97 F.3d 91, 94 (5th Cir. 1996)(internal quotations and citation omitted). We emphasize that only alleged violations of *procedural due process* may be negated by the Parratt/Hudson doctrine. Davis v. Bayless, 70 F.3d 367, 375 (5th Cir. 1995). Accordingly, violations of substantive due process rights do not fall within the doctrine's limitations. Al-Ra'id v. Ingle, 69 F.3d 28, 32 n.2 (5th Cir. 1995).

The district court found that Ms. Cozzo complained neither of the procedures surrounding Mr. Cozzo's acquisition of the TRO nor of the attendant review procedures. Cozzo, 2000 WL 6280, at *11. It concluded instead that Ms. Cozzo's complaint was that the Sheriff's Department's interpretation of the TRO to require eviction, and its subsequent action thereon, deprived her of her substantive due process right to possess her home. Id. As such, the court held that "[Ms.] Cozzo's claim is a substantive due process violation and is not negated by the *Parratt/Hudson* doctrine." Id.

The district court's application of the Parratt/Hudson doctrine presents a question of law that we review de novo. Alexander v. Ieyoub, 62 F.3d 709, 712 (5th Cir. 1995). In light of the circumstances underlying this case, we find that the court accurately opined that Ms. Cozzo raised

22

a claim regarding her substantive rights. See United States v. James Daniel Good Real Prop., 510 U.S. 43, 77, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993)("The sanctity of the home recognized by this Court's cases is founded on a concern with governmental *intrusion* into the owner's possessory or privacy interests–the domain of the Fourth Amendment.")(internal quotations and citations omitted)(emphasis in original); Freeman v. City of Dallas, 242 F.3d 642, 656 (5ᵗʰ Cir. 2001)(citing the Court's reasoning that "a seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property" and stating that "[w]e fail to see how being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment")(internal quotations and citations omitted). Accordingly, we find no error in the district court's decision declining to dismiss Ms. Cozzo's case pursuant to Parratt/Hudson. See Davis, 70 F.3d 367 at 375 (concluding that the plaintiff's allegations that the defendants "effected a warrantless entry into the . . . home and seized personal property in ostensible satisfaction of [a] debt" to be "sufficient to state a substantive due process claim under the Fourth Amendment"); Augustine v. Doe, 740 F.2d 322, 325-27 (5ᵗʰ Cir. 1984)(finding that the warrantless entry to arrest and subsequent seizure of plaintiff's dog constituted a substantive due process claim to which Parratt was inapplicable).

III.    Evidentiary Rulings

A.    State Court Judge's Comments

Sheriff Layrisson and Deputy Joiner next contend that the district court erred by admitting Ms. Cozzo's testimony regarding the state court judge's comment that she should "sue the sheriff." The judge made this statement during the hearing held to determine the use of the Cozzos' former matrimonial domicile. Overruling defense counsel's objection to the testimony as hearsay and

23

irrelevant, the district court allowed Ms. Cozzo to reiterate dialogue from the state court hearing. Counsel for Ms. Cozzo then introduced the actual transcript of the hearing.[13] Defense counsel again objected, stating that the transcript was hearsay and irrelevant. Reasoning that the transcript is part of the official record of the clerk's office, the district court overruled defense counsel's objection. On appeal, Layrisson and Joiner claim that the court's statements were not only inadmissible hearsay, but also unduly prejudicial under Rule 403.

The district court did not address Layrisson and Joiner's hearsay claim, but reasoned that the admission of the transcript was proper because "[t]he state judge who signed the order was the authority who could best determine the intent of the order." Cozzo, 2000 WL 6280, at *7. As such, the district court concluded that "[t]he fact that the state judge clearly did not envision that the sheriff would use the order to evict the plaintiff was *extremely relevant*." Id. (emphasis added). Accordingly, the court found meritless Layrisson's and Joiner's contrary argument that the danger of unfair prejudice outweighed this probative value. Id.

---

[13]The pertinent exchange from the state court hearing is as follows:

| | |
|---|---|
| THE COURT: | When you say evicted, what do you mean evicted? |
| MR. REED: | Well the sheriff put her out. |
| THE COURT: | Why? |
| MR. REED: | Because he took the law in his own hands. There was no order ordering her out of the premises. |
| THE COURT: | Well, you need to sue the sheriff. They're not supposed to be doing that kind of thing without a court order. |

"We review a district court's evidentiary rulings for abuse of discretion." United States v. Cantu, 167 F.3d 198, 203 (5th Cir. 1999). However, if we determine that the district court erred in admitting hearsay evidence, we must additionally decide whether the admission was harmless. Id.

The district court's conclusion that the transcript of the state court hearing was an admissible public record is persuasive. We accordingly find no error in the court's having admitted the hearing transcript. See id. at 204 (opining that "certified court records are public records, thereby falling within the public records exception to the hearsay rule"). Ms. Cozzo's testimony does not, however, fall so neatly within a recognized exception to the prescription against hearsay. Thus, this court must determine whether its admission was harmless.

This query implicates the potentially prejudicial effect of Ms. Cozzo's testimony regarding the state judge's declaration. See United States v. Carrillo, 20 F.3d 617, 620 (5th Cir. 1994). "The more directly an out-of-court declaration implicates the defendant, the greater the danger of prejudice. Conversely, when the statement does not directly implicate the defendant, the probative value outweighs the prejudicial effect." Id.; United States v. Johnston, 127 F.3d 380, 394 (5th Cir. 1997). Because the instant out-of-court declaration specifically addressed the sheriff, it directly implicated Layrisson. However, we agree with the district court. In light of Layrisson's and Joiner's relentless contention that the TRO mandated Ms. Cozzo's eviction, the statement's revelation of the TRO's intended scope, as contemplated by the judge that signed the order, imbued it with overwhelming relevance that substantially outweighed any potentially unfair prejudice. Because the "sue the sheriff" statement did not directly implicate Deputy Joiner, this rationale is even more applicable to him. Moreover, as previously discussed, evidence of the judge's statement was properly

before the jury via the transcript. Accordingly, the district court's admission of Ms. Cozzo's testimony about statements made by the judge during the state court hearing was harmless.

B.      Expert Testimony

Sheriff Layrisson and Deputy Joiner contend that, because the training standards applicable to Louisiana peace officers exceed the scope of Kent's expertise, the district court improperly allowed him to testify as an expert on the subject. They argue that he grossly misstated the training requirements imposed by law for deputies serving court orders and other process. In support of this argument, they point to the statutory definition of a "peace officer:"

> "Peace officer" means any full-time employee of the state, a municipality, a sheriff, or other public agency, whose permanent duties actually include the making of arrests, the performing of searches and seizures, or the execution of criminal warrants, and is responsible for the prevention or detection of crime or the enforcement of the penal, traffic, or highway laws of this state, but not including any elected or appointed head of a law enforcement department.

LA. REV. STAT. ANN. § 40:2402(1)(a). Although they did not proffer this evidence at trial, Layrisson and Joiner essentially assert on appeal that the statutory definition of a peace officer supports the trial testimony of Peoples and Joiner that civil deputies are exempt from the state required training under LA. REV. STAT. ANN. § 40:2405A(1), which formed the basis of Kent's expert testimony.

The district court concluded that "Kent was qualified to testify regarding . . . [LSA-R.S. 40:2405], and to the extent that the statute was marginally relevant, the admission of the testimony was harmless." Cozzo, 2000 WL 6280, at *7 (alteration in original). This conclusion is subject to review for abuse of discretion. See United States v. Wise, 221 F.3d 140, 148 (5th Cir. 2000)("[T]he proper standard for reviewing a district court's admission or exclusion of expert testimony is abuse of discretion.")(citations omitted). Moreover, the district court correctly observed that the admission

26

of erroneous expert testimony is subject to harmless error analysis. See United States v. Griffith, 118 F.3d 318, 323 (5th Cir. 1997). We observe without deciding, however, that even if the admission of Kent's testimony was improper, any resulting error is harmless as this court has already determined that the district court erroneously denied qualified immunity to Sheriff Layrisson against Ms. Cozzo's failure to train supervisory liability claim. See supra Part I.C.2.

IV.     Jury Instructions

Sheriff Layrisson and Deputy Joiner contend that the district court improperly instructed the jury under the deliberate indifference standard, claiming that the Supreme Court rejected that standard in County of Sacramento v. Lewis, 523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). They assert that the appropriate standard is whether the disputed official action "shocks the conscience." See County of Sacramento, 118 S. Ct. at 1717-18.

The district court considered this issue and determined that County of Sacramento, which enunciated the standard of culpability applicable to law enforcement officers who violate substantive due process in a pursuit case, did not repudiate the deliberate indifference standard. Cozzo, 2000 WL 6280, at *4 (citing County of Sacramento, 118 S. Ct. at 1718-19 ("As the term deliberate indifference implies, the standard is sensibly employed only when actual deliberation is practical.")). The court noted instead that the Supreme Court recognizes deliberate indifference as the appropriate standard of culpability to sustain a failure to train supervisory liability claim. Id. at *5 (citing Canton, 489 U.S. at 388-89). Finding not only that "Joiner, . . . Peoples, and Layrisson had an opportunity to deliberate to determine whether in fact eviction was called for," but also that Ms. Cozzo specifically requested that Joiner and Peoples reconsider their decision to evict her, the court concluded that the jury was properly instructed as to the applicable standard of liability. Id.

27

This court reviews challenges to jury instructions for abuse of discretion. <u>United States v. Huynh</u>, 246 F.3d 734, 738 (5th Cir. 2001). Because of the broad discretion afforded district courts in framing the instructions to the jury, we will find such an abuse of discretion only if the charge as a whole is not a correct statement of the law and does not clearly instruct the jurors regarding the legal principles applicable to the factual issues before them. <u>Id.</u> We agree with the district court's assessment that the facts surrounding Ms. Cozzo's eviction distinctly differ from the circumstance of pursuit in <u>County of Sacramento</u> and conclude that the court properly instructed the jury pursuant to deliberate indifference standard of culpability.

Sheriff Layrisson and Deputy Joiner also contend that the district court erroneously instructed the jury regarding the definition of two terms. They base this argument on the jury having asked the court "[w]hat is the legally accepted definition of the word[s] 'reside' and 'residence'?" The court responded that "[t]here is no difference between the two" and asked counsel whether they had any objections to that answer. Counsel for Layrisson and Joiner replied: "No, Your Honor." As such, they failed to preserve this issue for appeal, and we will only review it for plain error. <u>See Hartsell v. Dr. Pepper Bottling Co. of Tex.</u>, 207 F.3d 269, 272 (5th Cir. 2000). "To overturn a verdict for plain error in the instructions, we must find an obviously incorrect statement of law that was probably responsible for an incorrect verdict, leading to substantial injustice." <u>Tompkins v. Cyr</u>, 202 F.3d 770, 784 (5th Cir. 2000). The aforementioned alleged inadequacy does not meet this high standard. Thus, the district court's instruction does not constitute reversible error.[14]

---

[14]Sheriff Layrisson additionally argues on appeal that the district court misinstructed the jury as to the applicable standard for supervisory liability. Because we have held that the district court erroneously denied Sheriff Layrisson qualified immunity against Ms. Cozzo's claims, the propriety of the supervisory liability instruction is a moot issue. We accordingly pretermit its discussion.

V.    Damages

Finally, Sheriff Layrisson and Deputy Joiner assert that Ms. Cozzo should have been awarded neither compensatory damages for the expenses she incurred adding a room to her daughter's house nor damages for her alleged pain and suffering. They claim that the renovation expenses were not reasonably foreseeable or proximately caused by the eviction and that Ms. Cozzo failed to adduce evidence sufficient to sustain an award for pain and suffering. Surmising that the evidence well supported the jury's award, the district court found Layrisson's and Joiner's damages argument unpersuasive and declined to set aside Ms. Cozzo's damages award. Cozzo, 2000 WL 6280, at *8.

This court will reverse a jury's assessment of damages only for clear error. Pendarvis v. Ormet Corp., 135 F.3d 1036, 1038 (5th Cir. 1998). An award is clearly erroneous when "it is so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive." Ham Marine, Inc. v. Dresser Indus., Inc., 72 F.3d 454, 462 (5th Cir. 1995). When, as in the instant case, the district court has approved the award, the balance is tipped "even more heavily against appellate reconsideration." Id.

The jury's $10,000 award to Ms. Cozzo for living expenses that she incurred during the nearly six-month interim between her eviction from and reentry to her home and its $15,000 award for pain and suffering are not so large as to shock our judicial conscience nor are they contrary to right reason. Moreover, the damages awarded are not so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive. Our review of the record comports with that of the district court. We too conclude that the $10,000 and $15,000 damages awards were not clearly erroneous. As the district court so articulately delineated, the jury's award of damages merely represents its

29

determination of the living and displacement expenses as well as a reasonable valuation of the pain and suffering that Ms. Cozzo experienced as a result of her unconstitutional eviction. Cozzo, 2000 WL 6280, at *8.   Therefore, this court will not set aside these awards.[15]

CONCLUSION

For the forgoing reasons, we REVERSE the district court's denial of Sheriff Layrisson's qualified immunity claim and the punitive damages awarded against him, but AFFIRM the court's ruling in all other aspects.

AFFIRMED IN PART AND REVERSED IN PART.

---

[15]Sheriff Layrisson did not contest the award of punitive damages.  This court must nonetheless reverse the $35,000 in punitive damages that the jury assessed against him exclusively, responding to jury interrogatory # 4 that Deputy Joiner's conduct was not so offensive as to justify a punitive damages award, because we have held that the district court erred in denying Sheriff Layrisson qualified immunity against Ms. Cozzo's claims. See GAIA Techs., Inc. v. Recycled Prods. Corp., 175 F.3d 365, 373 (5th Cir. 1999)(reversing a punitive damages award after finding that the defendant was not liable).